## Case No. 15,933.
### UNITED STATES v. ONE HUNDRED AND FIFTY-SIX PACKAGES OF TEA.

[2 Int. Rev. Rec. 22.]

District Court, S. D. New York. July, 1865.

NON-INTERCOURSE ACT—CONFISCATION OF GOODS.

[Merchandise ordered from China by merchants of Richmond, Va., and originally consigned to them, but for which, three days before the president's proclamation of August 16, 1861, declaring that part of Virginia in a

state of insurrection, and prohibiting intercourse with the inhabitants thereof, such merchants executed an assignment to New York creditors to cover advances previously made by the latter, and which merchandise, on its arrival at the port of New York, passed into the care and custody of such assignees, and was discharged under a general order by which the rest of the cargo was discharged, and was then placed in the public stores, was not liable to confiscation, under such proclamation and the act on which it was based, as "proceeding" to a hostile state.]

The facts of the case were substantially as follows: The tea was shipped in May, 1861, by Russell & Co., of Shanghae, on board the ship Dora, bound to New York, and was consigned to Edmund Davenport & Co., of Richmond, Virginia. In October, 1861, the vessel arrived in this city, and the tea was seized here by the collector of the customs. Messrs. Paxson's Son & Co., the New York agents of Davenport & Co., put in their claim for the tea, under an assignment of Davenport & Co., made to them a day or two before the issuing of the proclamation under the non-intercourse act. The letter containing the assignment reached the postmaster-general, but not Paxson's, Son & Co. They did nothing in relation to the property, except put in this claim. The questions which arose were very interesting and complicated, but after thorough argument upon the verdict originally obtained for the government, the tea was awarded to the claimants.

SHIPMAN, District Judge. In the spring of 1861, one hundred and fifty-six packages of tea were shipped from China to the port of New York, consigned to and owned by Edmund Davenport & Co. This firm was located in Richmond, Virginia, where its members resided, and were large dealers in groceries, including teas. Samuel C. Paxson's Son & Co. were merchants in and resided at the city of New York, and had for a long time been correspondents of Davenport & Co., had taken charge of the goods consigned to the latter at New York, and when proper forwarded the same to them at Richmond, Va. The latter also acted generally as the agents of the former in New York, purchased goods for them, and received consignments for them from different parts of the world. Prior to the 13th of August, 1861, Paxson's Son & Co. had purchased for Davenport & Co. a large quantity of flour, which had been shipped abroad, and had made advances on the same, for which the latter firm were indebted to them in the sum of $16,158.20. On the 13th of July, 1861, congress passed an act entitled "An act further to provide for the collection of duties on imports, and for other purposes," the fifth section of which provides "that whenever the president, in pursuance of the provisions of the second section of the act entitled 'An act to provide for the calling forth' of the militia to execute the laws of the Union, suppress insurrections

and repel invasions, and to repeal the acts now in force for that purpose, approved February 28, 1795,' shall have called forth the militia to suppress combinations against the laws of the United States, and to cause the laws to be duly executed, and the insurgents shall have failed to disperse by the time directed by the president, and when said insurgents claim to act under the authority of any state or states, and such claim is not disdained or repudiated by the persons exercising the functions of government in such state or states, or in the parts thereof in which such combination exists, nor such insurrection be suppressed by said state or states, then in such case it shall be lawful for the president by proclamation to declare the inhabitants of such state of any section or part thereof where such insurrection exists, are in a state of insurrection against the laws of the United States, and thereupon all commercial intercourse by and between the same, and the citizens thereof, and the citizens of the rest of the United States, shall cease and be unlawful so long as such condition of hostility shall continue, and all goods, chattels, wares and merchandise coming from said state or section, into the ports of the United States, and all proceeding to such state or section by land or water, shall, together with the vessel or vehicle conveying the same, or conveying persons to or from such state or section, be forfeited to the United States." There are provisions to this section, but they have no material bearing upon the case now under consideration. The contingency contemplated by this act having arisen, the president, in pursuance thereof, on the 16th day of August, 1861 [12 Stat. 1262], issued a proclamation declaring certain states and sections, including that part of Virginia in which Richmond is situated, in a state of insurrection, declaring unlawful and prohibiting commercial intercourse between the inhabitants thereof and other parts of the United States, and forfeiting to the United States all goods, chattels, wares and merchandise coming from or proceeding to said hostile states or section, from other parts of the United States, without the special license and permission of the president. On the 13th of August, 1861, three days before the issuing of this proclamation, Edmund Davenport & Co. at Richmond executed an assignment of the teas in question to Samuel Paxson's Son & Co., of New York, directing the latter to hold the same to cover advances made by them for the Richmond firm, and for which there was then due to Paxson's Son & Co. the sum of $16,158.20. This assignment was endorsed in a letter directed to S. C. Paxson's Son & Co., New York, with a United States three cent postage stamp on the envelope, and was no doubt immediately despatched on its way to New York. It, however, never reached the parties to whom it was directed, but in some way came into the hands of one of the assistant postmas-

ters-general of the United States, and was by him transmitted to the custom house authorities at New York. Subsequently, on the 12th of October, 1861, the teas arrived at New York by the British ship Dora. The discharging of the ship was proceeded with under a general order, under the supervision of an inspector of customs. These teas, were, however, kept on board by the direction of Deputy Surveyor Brown, until the balance of the cargo was nearly or quite all discharged, when they were finally taken to the public stores Nos. 56 and 58 Greenwich street, where they remained until the 12th of November, 1861; when they were seized and forfeited to the United States. A libel of information was filed in the district court for the Southern district of New York, alleging a forfeiture on the ground that the goods were, at the time of the seizure, proceeding to the state of Virginia, in violation of the act of congress and the proclamation of the president heretofore cited; and also on the further ground that they were intended to be used for insurrectionary purposes contrary to the 1st section of the act of August 6, 1861 [12 Stat. 319], entitled "An act to confiscate property used for insurrectionary purposes." Samuel C. Paxson's Son & Co. have filed a claim for the teas, alleging that at the time of the seizure they were the lawful owners thereof and entitled to possession of the same; and also a plea denying that they were forfeited to the United States. The case was tried by the jury, and as there was no dispute about the material facts, by request and assent of counsel on both sides, the court directed a verdict for the United States, subject to the opinion of the court on the questions of law arising on the conceded or proved and undisputed facts. The question now is, shall the verdict stand, or be set aside, and the libel dismissed?

These goods must have been ordered by Davenport & Co. long before the commencement of hostilities. They were one of the ordinary classes of merchandise in which the firm had long dealt, and there is no fact in the case from which an inference can be drawn that they were intended for insurrectionary purposes. No plausible ground has been shown for confiscating these goods under the act of the 6th of August, 1861. The only other question is, were they "proceeding" to Richmond in any sense of the word, at the time of their seizure? They had come by sea from China, in due course of trade, to New York; and though originally owned by and consigned to Edmund Davenport & Co., of Richmond, when they arrived at New York they passed, under an established arrangement entered into long before, into the care and custody of Paxson's Son & Co., and were discharged under the general order. by which the rest of the cargo was discharged. They were discharged and placed in the public stores, where they remained some two or three weeks. when they were seized as forfeited to the United States

on the ground that they were proceeding to Virginia, in violation of the act of July 13, 1861, and the proclamation of the president in pursuance thereof. What is the undisputed evidence on this point? The goods were not in fact proceeding to Virginia, but were lying in the public stores in New York. Now, in view of the undisputed evidence can they be said to have been in construction of law, in transit to Richmond? As they were not in fact being transported, whether they were constructively so or not, must depend on the intention of the parties who had the disposition of them. The uncontradicted proof is that the New York firm whose duty it was to take the care and custody of these goods here, did not intend that they should proceed to Richmond, but on the other hand they intended to retain the goods, subject to the order of Davenport & Co. The latter were heavily indebted to them, and their interest was strongly in favor of retaining the goods in New York. The ports of Virginia were already, and for a long time had been blockaded by the United States, and there is nothing in the case which throws the remotest suspicion upon the loyalty of Paxson's Son & Co., or can authorize the court. to infer that they were intending to ship these goods to Virginia, in violation of the blockade, the statute, and the president's proclamation. Their whole interest was to keep the goods here, and I think the undisputed evidence conclusively shows that such was their intention. These teas, then, resting in the storehouses at New York, subject to the control of no one there except the authorities of the custom house and Paxson's Son & Co., were not by any intendment of either, either in fact or constructively, proceeding to Richmond. On the other hand, what was their status, so far as Edmund Davenport & Co. were concerned? On the 13th of August, three days prior to the proclamation of the president, Davenport & Co. executed and sent forward the assignment and order already referred to directing Paxson's Son & Co. to hold these teas in New York, as an offset to the debt due the latter from the former firm for advances. True, this paper did not reach Paxson's Son & Co., but did reach the custom house authorities, and they had it in their hands when they seized the teas. This document, whether valid as an assignment or not, clearly rebuts the presumption of any intention on the part of Davenport & Co., to have these teas proceed to Richmond. On the contrary, it is the most cogent evidence of their intention that they should not proceed to Richmond, but should be held in New York and applied in the discharge of the debt due their New York correspondents. These goods, then, were neither in fact nor constructively, through the intendment of any party, "proceeding" to Richmond or any other hostile section, in violation of any law of congress or proclamation of the president. They were, both by Davenport & Co., and Paxson's Son & Co., intended to remain in New York. The or-

der from the former to that effect was made before the proclamation interdicting commercial intercourse between the two sections, and was lawfully made, and the transmission of it by mail or otherwise contravened no statute or proclamation. Nay, more, it was an act which Davenport & Co. were in duty bound to perform, both to prevent an infraction of law and to protect their New York creditors, and was, therefore, in compliance with, and furtherance of, the very object of the statute and proclamation upon which this prosecution is founded. It follows from these views that the verdict must be set aside, and that the libel should be dismissed.